IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VERTULIE LAPRE, Administrator of the Estate of Okoi Ofem, | ) ) ) |
| Plaintiff, | ) No. 15 C 3199 ) |
| v. | ) Judge Virginia M. Kendall ) |
| CITY OF CHICAGO, | ) ) |
| Defendant. | ) ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Vertulie Lapre, Estate Administrator, through her counsel brought this suit against Defendant City of Chicago and Defendant Officers pursuant to 42 U.S.C. § 1983 after her son Okoi Ofem committed suicide while detained after his arrest at the City's District 4 Lockup. The Parties stipulated and dismissed with prejudice all claims against the individual officers. (Dkt. 115.) The City now moves for summary judgment on the remaining claim: Count III of the First Amended Complaint alleging a *Monell* claim against the City. For the following reasons, the Court grants the City's Motion for Summary Judgment against Lapre. (Dkt. 118.)

**BACKGROUND**

The parties do not dispute the following facts unless otherwise noted.

**I.   Ofem's Arrest and Suicide**

On September 12, 2013 around 1:37 PM, Chicago Police Officers arrested Okoi Ofem ("Ofem.") (Dkt. 122, ¶ 8.) Ofem was taken to the District 4 Lockup for processing. (Dkt. 122, ¶ 9.) Per policy, lockup personnel took Ofem's shoelaces, belt, and keys and placed them into inventory. (Dkt. 122, ¶ 14.) Ofem's Processing Report states that he did not appear to be despondent or irrational. (Dkt. 120-6, at 5.) The Report also states that Ofem reported that he

1

had not attempted suicide or serious harm to himself, and he did not have any serious medical or mental problems. (*Id.*) He was placed in Cell A-3, a one person cell. (*Id.*) At no point from his arrival to his criminal court visit did Ofem inform any Chicago Police personnel that he was contemplating self-harm or suicide.[1] (Dkt. 122, ¶ 19.) Early the next morning, on September 13, Ofem left the Lockup to visit the criminal court. (*Id.* ¶ 16.) On his ride back, he did not indicate any change in suicidal or self-harm ideation. (*Id.* ¶ 22.) However, he returned from court around 10:00 AM "surprised" according to Officer James Carrillo. Ofem asked what was happening, and Carrillo told him that to the best of his knowledge Ofem had been sent to the wrong court. (Dkt. 124-18, 10:3-15:11.) Ofem had been charged with a misdemeanor, not a felony. Carrillo told Ofem that Ofem would have to go to court at 26th and California. (Dkt. 122, ¶ 38.) Carrillo asked Ofem if he wanted anything to eat, and Ofem declined. (*Id.* ¶ 26.) Ofem still did not inform Carrillo or any officer that he was contemplating suicide or self-harm. (*Id.* ¶ 25.)

The Lockup's logs from that day show that someone visually inspected Ofem every 15 minutes between 10:00 AM and 12:45 PM.[2] At least some of these visual checks happened in person. Mary Grobarcik, District Station Supervisor, conducted a walk-through of the Lockup at 11:30 AM. (*Id.* ¶¶ 31, 35-36.) During each in-person check, Ofem was asked if he would like something to eat. Each time, Ofem refused. (*Id.* ¶ 37.) At 12:45 PM, Carrillo checked on Ofem in person, along with Detention Aide Dennis Graham. Ofem stood off to the side, fully-clothed. (Dkt. 120-6, 102:9-103:8.) At 1:00 PM, Carrillo again checked on Ofem, this time through the livestream video monitor. (*Id.*, 101:13-23.) At that time, only one of the eight video monitors at

---

[1] The Parties dispute whether Ofem ever appeared to be despondent or irrational, as no official noted this language affirmatively in the Processing Report or their testimony, but Detention Aide Williams Zaremba described Ofem as "mift" [*sic*] and Officer James Carrillo described him as "tired." (*See* Dkt. 122, ¶ 18.)

[2] The City claims that these inspections occurred by officers in person, but Lapre provides an expert's testimony disputing the accuracy of these records and witness testimony by Lockup officers and personnel that visual checks could also occur by looking at the facility's video monitors, which the logs do not necessarily distinguish. (*See* Dkt. 122, ¶ 31.)

the Lock-up personnel desk worked. The monitor's camera did not depict a clear picture. (Dkt. 133, ¶ 12.) At approximately 1:10 PM, Graham looked at the video monitor. He noticed Ofem hanging from his cell. (Dkt. 122, ¶ 49.)

Carrillo and Graham went to Ofem's cell. They discovered that Ofem had used his jeans to tie a noose around his neck. Ofem tied the other end to the horizontal bar in his cell such that the cell door could not easily open. (*Id.* ¶¶ 50-51.) Officer Carrillo yanked the cell door several times to open it. Graham took a pocket knife and cut the jeans from Ofem's neck. Officer James Mangan ran to call for medical assistance. (*Id.* ¶¶ 52-54.) The suicide occurred less than ten minutes but "probably less than five minutes" before they found him. (*Id.* ¶¶ 70, 73.)

When the jeans were removed from his neck, Ofem let out a groan. Carrillo administered chest compressions. (*Id.* ¶ 55.) The paramedics arrived, and Ofem still had a pulse. (*Id.* ¶ 57.) He was transported to Trinity Hospital but died from the injuries he sustained. (*Id.* ¶ 58.)

## II. Policies

On September 12 and 13 of 2013, Chicago detention facilities operated under Special Order S06-01-02, issued by the Chicago Police Department, governing the facilities' procedures and responsibilities ("Special Order"). (Dkt. 120-25.) Among other responsibilities, the Special Order provides that lockup personnel will:

> 7. [P]rior to accepting any arrestee, conduct an initial inspection of the subject following the Guidelines for Arrestee Screening and Monitoring chart...[3]
>
> 8. [I]f screening process indicates that the arrestee is perceived to be mentally/chemically impaired or suicidal, the station supervisor will be notified immediately.

---

[3] Defendants say that Paragraph 7 requires personnel to not only assess arrestees upon their initial intake, but that since the facility must re-accept arrestees returning from court into the lock-up, personnel must re-assess arrestees at that time. (Dkt. 131, at 8.) Plaintiffs argue that Lockup officers and personnel do not ask the questions in the questionnaire again when arrestees return from court, but does not cite to evidence of this practice besides Detention Aide Zaremba testifying that he was not familiar with whether or how the facility conducted such a practice. (*See* Dkt. 133, ¶ 25.)

> *9. [N]ot accept any arrestee…who has injuries…that may require hospitalization or the immediate attention of a healthcare professional…*
>
> *13. [C]omplete the intake screening questions process following the Guidelines for Arrestee Screening and Monitoring Chart…*

(Dkt. 120-125, at 2.) Further, the Special Order notes that, in instances where an arrestee responds "yes" to the arrestee questions of "attempted suicide/serious harm," or the visual check determines the arrestee to be despondent, the lockup personnel will check the corresponding box. When the arrestee was a "present or prior" danger to themselves "i.e. attempt suicide, caused harm to self, despondent," lockup personnel was to place the arrestee in a cell closest to the lockup keeper. (*Id.*, at 3, ¶¶ 16-18.) The Special Order also provides that personnel will:

> *23. [C]omplete a visual check of every arrestee **every 15 minutes** following the Guidelines for Arrestee Screening and Monitoring chart and record the time of each inspection, a concise statement of conditions found, notable occurrences, actions take [sic], if any, and the initials and employee identification number on the Inspection Log…*

(*Id.*) (emphasis in original). Finally, the Order requires the Station Supervisor to ensure the above and "at a minimum, independently conduct thorough inspections of the lockups and arrestees at least four (4) times per tour…." (*Id.*, at 4.) At the bottom, Police Superintendent Garry McCarthy includes his name. (*Id.*)

Also in effect at that time, Illinois's Municipal Jail and Lockup Standards ("Illinois Lockup Standards" or "Standards") provide treatment and conditions standards for municipal lockups throughout the state. The Standards provide that jail officers or other qualified staff shall supervise people who are confined, including visual checks "by personal inspection…not including observation by a monitoring device" at least every 30 minutes for detainees and every

4

15 minutes for restrained individuals. (Dkt. 124-16, at 6, Section 720.60(a).)[4] City personnel had also exchanged e-mails back in December 2011 discussing a proposal for cameras and for cells without bars in the newer facilities, as "that played a factor in the 2 recent suicides." (*See* Dkt. 124-33; 124-47.)

## III. Trainings

Besides including the Employee Training Records for officers and personnel who are relevant to this case (Dkt. 120-1 – Dkt. 120-5), the record does not show the content of the trainings that these individuals received prior to Ofem's death. However, the record shows the July 2014 revised materials from the Chicago Police Crisis Intervention Team entitled "Lockup Personnel Mental Health Training Overview" and "Suicide, Sudden In-custody death, & Other Detaining Issues." (Dkt. 124-14; Dkt. 124-15.) These provide that over a quarter of all in-custody suicides occur within the first three hours of arrest. Most of these occur when the inmate is in a single cell or isolation. Ninety-four percent of in-custody suicides occur by hanging using a ligature fashioned out of bedding or clothing. (Dkt. 124-14, at 15; Dkt. 124-15, at 4.) The peak hours for jail suicides arise between the hours of 12:00 AM midnight and 3:00 AM "when the staffing is the lowest." (Dkt. 124-15, at 5.) The latter training indicates a number of risk factors and signals for suicide. General warning signs include shifts in mood, withdrawal, and trouble eating. (*Id.*, at 2-3.) For new detainees, the presentation offers that signs of depression like crying or verbalizing hopelessness suggest risk. (*Id.*, at 8.) It also states that new detainees are at risk within the first 24 hours of incarceration and around the time of a court appearance, and also that arrestees will "[u]sually admit to suicidal thoughts." (*Id.*) The training advises next steps and ways to communicate with the arrestee. (*Id.*, at 28-33.) The Parties dispute whether

---

[4] In her Response, Plaintiff highlights that the Standards provide for comfortable temperatures, personal supplies like tissue and soap, drinking cups or a water fountain, clean bedding, three 1,800+ calorie meals per day, and a drink other than water with meals. (*See* Dkt. 123, 8-9; Dkt. 124-16.)

5

Graham, Zaremba, and Mangan received Crisis Intervention Training on mental health in 2010 (Dkt. 132, ¶¶ 3, 5-6), and the record does not indicate that Carrillo received such training, nor that these personnel received training on first aid or the Illinois Standards. (*Id.*, ¶ 76.)

## **LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the underlying substantive law. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012) (citation omitted). "A factual dispute is 'genuine' only if a reasonable jury could find for either party." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation marks and citation omitted). Because the plaintiff bears the burden of persuasion, the defendant's summary judgment burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 234 (7th Cir. 2014). "Upon such a showing, the nonmovant must then 'make a showing sufficient to establish the existence of an element essential to that party's case.'" *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (quoting *Celotex*, 477 U.S. at 322). The nonmovant must "go beyond the pleadings…to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor." *Id.* at 1168-69 (internal quotation marks and citation omitted). Plaintiff must use more than a "scintilla of evidence." *Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 650 (7th Cir. 2014) (internal quotation and citation omitted). Summary judgment is appropriate where "no reasonable jury could rule in favor of the nonmoving party." *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016) (citation omitted).

**DISCUSSION**

Between the First Amended Complaint ("FAC") and Response Lapre serves a litany of theories and bases for her *Monell* claim against the City of Chicago. In Count III of her FAC, Lapre alleges "the need for more or different training"; that Chicago police officers at the lockup "failed to properly supervise" and "failed to protect Okoi Ofem from harm and danger," incorporating the foregoing Section 1983 claims against individual officers on procedural due process/state-created danger grounds (Count I) and due process/special relationship grounds (Count II). Lapre alleges that these violations were "caused in part by the customs, policies, and practices of the defendants, as promulgated, enforced, and disseminated by City of Chicago and City of Chicago Superintendent Garry McCarthy and their various departments, agencies and subsidiaries…" (Dkt. 38, ¶¶ 50-71.) Lapre then identifies twelve customs, policies, and practices that allegedly caused such deprivations.[5] In her Response, Lapre points to "various policies and gaps in policies…including: [t]he City's custom of not following" – or training personnel on – "multiple Illinois Jail and Lockup Standards; [t]he City's failure to change the construction in all of its lockup facilities after dozens of detainees had attempted or committed

---

[5] Specifically, Lapre alleges: "(a) improper supervision and detainment of arrestees in their cells by City of Chicago Police Officers and Lockup Employees; (b) denial of due process against arrestees, placed in the care of the Chicago Police Department, by Chicago Police Officers and Lockup Employees; (c) failure to protect against physical harm, danger or death by Chicago Police Officers, Lockup Employees or self-harm; (d) a code of silence whereby officers refuse to report the unconstitutional and criminal misconduct of other officers, including the unconstitutional and criminal conduct alleged in this Complaint; (e) a code of silence whereby officers remain silent or give false and misleading information during official investigations to cover up unconstitutional and criminal misconduct, to protect themselves, and to protect other officers; (f) the willful, wanton, and deliberately indifferent failure to train, supervise, and discipline police officers in regards to unconstitutional and criminal misconduct; (g) the willful, wanton, and deliberately indifferent failure to train, supervise and discipline police officers in order to prevent unconstitutional and criminal misconduct by police officers; (h) the failure to adequately investigate and substantial allegations of unconstitutional and criminal misconduct by Chicago police officers; (i) the failure to adequately discipline police officers that engage in unconstitutional and criminal misconduct; (j) the encouragement and propagation of the misconduct complained of in sub-paragraphs (a)-(i) by stamping official approval on officers' unconstitutional and criminal misconduct through the failure to properly investigate and discipline officer misconduct; (k) the approval, support, and encouragement of unconstitutional and criminal misconduct by police officers to avoid financial loss; and (l) the failure to deter police officers from engaging in unconstitutional and criminal misconduct through deficient, defective, and ineffectual investigatory and disciplinary procedures." (Dkt. 38, ¶ 73.) Lapre does not brief issues (d)-(e), (h)-(l) in her Response, so the Court here does not consider them and construes them as waived.

suicide by hanging on horizontal bars; [and] [t]he City's policy of not reassessing returnees...." (Dkt. 123, at 8-9.) Lapre launches into how the Standards create protected liberty interests that give rise to Fourteenth Amendment due process protections, and that "[e]ven if a violation of the Standards itself is not a *substantive due process* violation, courts have consistently held that such violations are sufficient evidence of deliberate indifference." (*Id.*, at 9.) (emphasis added.) Finally, Lapre details arguments regarding the City's failure to completely remove horizontal bars from its cells; to not reassess detainees upon their return to the lockup; and failure to properly train personnel, including on suicide detection, mental health detection, the Illinois Lockup Standards, and first aid and life-saving techniques. (*Id.* at 11-13.)

Taken together with the record, the Court construes these allegations as a *Monell* claim that the City is liable for violations of Ofem's Fourteenth Amendment due process rights for: first, lacking policies that require lockup personnel to reassess detainees upon their return, to remove horizontal bars from cells at lockup facilities, and to conduct in-person check-ins at least every 30 minutes; second, widespread custom or practice that fails to follow the Illinois Lockup Standards; and lastly, failure to train lockup personnel on the Standards, first aid, and mental health, including signs of suicide. *See Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000) (pretrial detainee has right to be protected from self-destruction like suicide under Fourteenth Amendment due process provision).[6]

I. **Policy Gaps**

Section 1983 provides a remedy for those who have been deprived of their "rights, privileges or immunities secured by the Constitution and laws" by those acting under the color of state law. 42 U.S.C. § 1983. Under Section 1983, a municipality can be held liable for a

---

[6] In her Response and the Record, Lapre does not appear to provide evidence of a *Monell* claim pursuant to the final decision-making authority of a policymaker, so the Court does not construe or consider this claim on these grounds.

constitutional violation caused by an official policy (or lack thereof), widespread practice or custom, or an official who has final policy-making authority. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 (1978); *Hahn v. Walsh*, 762 F.3d 617, 638 (7th Cir. 2014) (citing *Monell*). Where rules or regulations must remedy a potentially dangerous practice, the municipality's failure to make a policy is also actionable. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). "This may take the form of an implicit policy or a gap in expressed policies…." *Id.* (internal citations omitted). To show such a policy gap claim with indirect evidence, a "plaintiff must introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision," beyond one or two missteps. *Dixon v. County of Cook*, 819 F.3d 343, 348 (7th Cir. 2016) (quoting *Phelan v. Cook County*, 463 F.3d 773, 790 (7th Cir. 2006)). The Court must look to whether a trier of fact could find gross, systemic deficiencies in staffing, facilities, equipment, or procedures, and even if so, that a policy-making official knew about those deficiencies and failed to correct them. *Id.* (citing *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988)).

### A.    Failure to Reassess Upon Return

Lapre contends that the City does not reassess detainees who return to the lockup once they finish with court. She submits testimony by Detention Aid Zaremba that, if any arrestee leaves for court and comes back, they are not asked the questionnaire again to his knowledge. (Dkt. 124-1, 30:23-31:2.) She looks to the Special Order, which does not provide a policy explicitly for when detainees arrive at lockup after having been received and processed previously, and she points out the absence of forms evincing lockup personnel following such a practice. (*See* Dkt. 123, at 12.) The City disputes that the Special Order does not so require

reassessment by virtue of what it already requires: that lockup personnel assess a detainee upon entry, meaning any entry, including re-entry. (*See* Dkt. 120-25, ¶ 7.) While disputed, this discrepancy is not material to Lapre's claim given that, under the law, in order to show deliberate indifference from a policy gap she would need to "introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Dixon*, 819 F.3d at 348. With such limited evidence, Lapre does not show that failure to reassess pervaded the City's lockups, or even this lockup. She points to the testimony of one detention aide who does not even affirmatively deny that the lockup reassessed detainees upon re-entry, but only says he is not aware of personnel conducting reassessments. (*See* Dkt. 124-1, 30:23-31:2.) The absence of forms demonstrating that lockup personnel conduct reassessments does not allow a plausible inference that they did not exist in light of a record that only shows the one assessment conducted on Ofem. (*See* Dkt. 124-17.) Without plausibly showing the extent of this policy gap, Lapre cannot show the acquiescence of policymakers in this regard, and certainly not beyond a "scintilla of evidence." *See Zuppardi*, 770 F.3d at 650. Accordingly, her claim cannot survive on this basis.

### B.  Failure to Remove Horizontal Bars

Section 1983 plaintiffs can also argue that a municipality maintained "inadequate" policies to protect them. *Butera v. Cottey*, 285 F.3d 601, 604 (7th Cir. 2002). Pre-trial detainees are protected from deliberate indifference to their safety, but municipalities or policy-making officials need not absolutely ensure their safety. *Id.* at 605; *Frake*, 210 F.3d at 781. "[W]hen the claim is based on a jail suicide we have determined that the protection a detainee receives is the same as that received by an inmate claiming inadequate medical attention under the Eighth Amendment." *Id.* at 781-82 (internal citations omitted). To find deliberate indifference, the

plaintiff must show that the municipality was "aware of a substantial risk of serious injury to the detainee but nevertheless failed to take appropriate steps…" *Id.* at 782 (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) and *Salazar v. City of Chicago*, 940 F.2d 233 (7th Cir. 1991)). "The existence or possibility of other better policies which might have been used does not necessarily mean that the [municipality] was being deliberately indifferent." *Id.* (citation omitted); *see also Butera*, 285 F.3d at 604. Numbers cannot tell the whole story. *Frake*, 210 F.3d at 782. When the City has taken other precautions to protect detainees, the Court cannot find that the continued use of cells as constructed with horizontal cross-bars amounts to deliberate indifference. *Id.*; *see e.g. Miller v. Kozel*, No. 10 C 5381, 2011 WL 5024554, at 17 (Oct. 19, 2011) (finding same for bunk beds under *Frake*).

No doubt, the horizontal bars in detainees' cells play a major role in the City's in-custody suicides and attempts. Nearly all in-custody suicides involve the detainee using a piece of clothing or bedding to tie himself up where he can access, frequently on his cell bars, as the record's incident reports show.[7] (*See* Dkt. 124-13; Dkt. 124-14, at 15; Dkt. 124-15, at 4.) But the persistence of horizontal cell bars in itself does not rise to the level of deliberate indifference. Like the claimant in *Frake*, here the record shows that despite the continued existence of horizontal cross-bars in some cells, the City has taken other precautions to keep detainees safe from suicide, including a thorough questionnaire administered during the screening process (*see* Dkt. 124-17), imposing policies that require personnel to check cells every 15 minutes (*see* Dkt. 120-25, ¶ 7), and removing items that could be used for suicide, like shoelaces, from detainees' possession (*see* Dkt. 122, ¶ 14). Lapre points to the December 2011 email exchanges as evidence of the City's knowledge of the issue that horizontal bars pose to suicidal prisoners. Yet

---

[7] The Court bases this statement on the record from the Chicago Police Crisis Intervention Team presentation (*see* Dkt. 124-13; Dkt. 124-14, at 15; Dkt. 124-15, at 4) dated July 2014. The record does not confirm or deny that the City had similar information at or before Ofem's death, so the Court resolves this in favor of non-moving Plaintiff.

11

that very exchange speaks to having a vendor in the wings and waiting on a proposal to address this issue, showing that if anything the City was deliberately taking steps towards making a difference. (*See* Dkt. 124-33; 124-47.) Even if the City could pursue a faster, more robust policy, that does not make its policy inadequate. *See Butera*, 285 F.3d at 604. Lapre does not show the violation of a constitutional right on these grounds. *See Frake*, 210 F.3d at 781-82.

### C. Failure to Conduct Sufficiently Regular In-Person Inspections

Lapre leans heavily on the Standards to argue that the City failed to conduct sufficiently regular check-ins with detainees. At least one court has found, as Lapre notes, that the mandatory language of the Standards creates a protected liberty interest. *See Strandell v. Jackson County, Ill.*, 634 F.Supp. 824, 828-29 (S.D.Ill. 1986). Indeed, evidence that the Illinois Lockup Standards do or do not approve of a certain policy can be instructive in a *Monell* claim for deliberate indifference to due process. *Id.* at 781. But they are not conclusive. *Id.* Plaintiffs must still show that a trier of fact could find systemic deficiencies in the procedures and, even then, that officials knew and failed to correct them. *See Dixon*, 819 F.3d at 348. The Illinois Standards only require lockup personnel to conduct check-ins, albeit in-person, every 30 minutes for otherwise unrestrained individuals. (Dkt. 124-16, at 6, Section 720.60(a).) Chicago's Special Order not only meets but exceeds this standard by requiring visual check-ins every 15 minutes. (Dkt. 120-25, ¶ 23.) The Special Order does not say one way or the other if these check-ins must occur in person, but the parties do not dispute that at least some of the time Lockup personnel conducted visual inspections via the video monitor. But even if the City had codified and implemented the in-person element of the Illinois Lockup Standard, Lapre presents no evidence that this would have altered the outcome here, given that Carrillo testifies to last inspecting Ofem in-person at 12:45 PM and Graham saw on the monitor by 1:10 PM that Ofem

12

was hanging – only 25 minutes later. (Dkt. 120-6, 102:9-103:8; Dkt. 122, ¶ 49.) Had Carrillo or Graham come by at 1:15 PM in person, that would not have made a difference. Ofem would have lost consciousness and then his life within less than 10 minutes and probably in less than 5 minutes of his hanging. (*Id.* ¶¶ 70, 73.) So they might have missed their window of opportunity to attempt to perform first aid while Ofem still had a pulse if they had instead abided by the rule to check in-person at least every 30 minutes. Since Lapre's alternative would not plausibly have affected the outcome in these circumstances, it cannot be said that the Special Order's provision *caused* any constitutional deprivation here. *See Hahn*, 762 F.3d at 638; *Monell*, 436 U.S. at 690.

Alternatively, even looking at these grounds as a pattern or custom where lockup personnel commonly viewed a detainee by video monitor instead of an in-person inspection, or did not accurately report their 15-minute interval inspections, a plaintiff still must establish a "series of unconstitutional acts from which it may be inferred that the [City] knew [CPD] officers were violating the constitutional rights of [CPD detainees] and did nothing." *Hahn*, 762 F.3d at 637; *see e.g.*, *Saucedo v. City of Chicago*, No. 11 C 5868, 2015 WL3643417, at *3 (N.D.Ill. June 11, 2015) (detainee's suicide and suicide rates alone did not establish widespread practice such that deliberate indifference inference could be drawn against City). Plaintiffs do not show that an in-person inspection every 15 minutes could so affect the detainee's sense of isolation as to prevent him from committing suicide. As such, Lapre cannot proceed with Count III on the basis that Lockup failed to provide regular in-person inspections.

II.     **Widespread Custom or Practice**

Similarly, in order to show that the City has deliberately ignored the widespread practice or custom that lockup personnel do not follow the Illinois Lockup Standards, a plaintiff must show that the practices, decisions of lawmakers, or acts of policymaking officials are "so

13

persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). The plaintiff must also demonstrate that the municipality is deliberately indifferent to the custom or practice's "known or obvious consequences." *See e.g.*, *Saucedo*, 2015 WL3643417, at *3 (citing *Thomas*, 604 F.3d at 303). Beyond in-person inspections at 30-minute intervals, Lapre enumerates a host of other provisions in the Standards and submits that the City is deliberately indifferent to ensuring these as well. That list includes comfortable temperatures, personal supplies (like tissue and soap), drinking cups or a water fountain, clean bedding, three 1,800+ calorie meals per day, and a drink other than water with meals. (See Dkt. 123, 8-9; Dkt. 124-16.) Even assuming that the City knew that the Lockup failed to provide any one of these and had actual or constructive notice of the facilities' suicide rates, the record completely fails to show how any of these circumstances lead to suicide in Ofem's case, or any case for that matter. This Court does not rule out the possibility, but suicide is by no means a "known or obvious consequence[]" of any custom or practice that fails to provide these Illinois Lockup Standards. *See e.g.*, *Saucedo*, 2015 WL3643417, at *3. It follows that Lapre does not provide evidence to support an inference of this causal link, as she cannot show that the custom or practice caused detainee suicides on a widespread basis. This basis for Count III also fails.

## III.  Failure to Train

Finally, Lapre argues that the City failed to train lockup personnel on the Illinois Lockup Standards, first aid, and mental health, including signs of suicide. Inadequate police training can serve as the basis for Section 1983 liability "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Deliberate indifference in a failure to train context can be shown one of two ways: failing to train employees on how to "handle a recurring situation that

14

presents an obvious potential for a constitutional violation" or failing to provide further training "after learning of a pattern of constitutional violations by the police." *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003) (internal citations omitted).

### A. On the Illinois Lockup Standards

Failure to train the personnel on the Illinois Lockup Standards cannot succeed for now familiar reasons: training officers to do in-person inspections every 30 minutes could not have changed the outcome here since Ofem was found hanging approximately 25 minutes after his last in-person inspection. As such, the plaintiff cannot establish that this omission led to Ofem's suicide, and thus cannot make out a *Monell* claim on these grounds. *See Monell*, 436 U.S. at 690. (*See* Dkt. 120-6, 102:9-103:8; Dkt. 122, ¶ 49.) Training lockup officers on the remaining Illinois Lockup Standards relating to temperature, supplies, food, and water does not plausibly relate to anything on the record that would address why these provisions led to Ofem's suicide or other in-custody suicides on a widespread basis. *See Dunn*, 347 F.3d at 646. This claim therefore cannot proceed on this basis.

### B. On First Aid/Life-Saving Techniques

Both Parties acknowledge that the City personnel first on the scene had not received training on first aid or life-saving techniques. (*Id.* ¶ 76.) But without even reaching whether the City was deliberately indifferent to the matter, again Lapre would need to show that the absence of training led to the constitutional deprivation that was Ofem's loss of liberty through his suicide. Even assuming in the light most favorable to Lapre that the training would have helped Carrillo and Graham know what to do, nothing in the records suggests that first aid training would have helped Graham, Carrillo, or other lockup officials in such circumstances. *See Dunn,* 347 F.3d at 646. (*See* Dkt. 122, ¶ 55.) The Court must view the evidence in the light most

favorable to the nonmoving party, but this analysis cannot rely on mere conjecture. Lapre does not offer evidence to support this claim at this stage, so the failure to train claim cannot move forwards on these grounds.

### C. On Recognizing Signs of Suicide and Other Mental Health Issues

Lapre's final claim is that the City is liable under § 1983 for failure to provide adequate training to its Lockup personnel regarding the risk of suicide and mental health issues for inmates in custody.[8] *Monell* liability for failure to train occurs either when the City's "actual policy and practice caused its employees to be deliberately indifferent to [an inmate's] serious health needs," or where a "series of bad acts creat[es] an inference that municipal officials were aware of and condoned the misconduct of their employees." *Minix v. Canarecci*, 597 F.3d 824, 832 (7th Cir. 2010) (internal citations omitted); *see also Estate of Novack ex rel. Turbin v. County of Wood*, 226 F.3d 525, 531 (7th Cir. 2000). Furthermore *Monell* claims concerning a suicide in custody require actual notice that an inmate is suicidal or contemplating self-harm regardless of the training received. *Minix*, 597 F.3d at 831; *see also Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 557 (7th Cir. 2003).

The City operated under Special Order S06-01-02, a policy requiring that Lockup personnel perform screenings, visual checks every 15 minutes, and have an action approach to protect inmates from the risk of suicide and other mental issues. (Dkt. 120-25.) The undisputed evidence shows that Lockup personnel complied with the policy. They performed visual inspections, the Processing Report demonstrated that Ofem appeared normal, and they quickly responded to Ofem's emergency upon discovery. As such, the policy and procedure itself cannot serve as the direct cause of Ofem's death. Thus, in order to pursue a *Monell* claim, Lapre must

---

[8] The Court notes that Lapre dismissed the claims against all individual officers and that this is specifically a *Monell* claim against the City of Chicago.

prove "a series of constitutional violations – as well as specific facts regarding the violations – rather than isolated acts of misconduct," that allow a trier of fact to infer that "the [City] knew [its employees] were violating constitutional rights of ... inmates and did nothing." *Saucedo*, 2015 WL3643417, at *3 (*quoting Hahn*, at 637). One incident is not a widespread pattern. *See, e.g., Otham v. City of Chicago*, No. 11 C 5777, 2014 WL 6566357, at *6 (N.D. Ill. Nov. 20, 2014).

Lapre argues that the City misunderstands the "deliberate indifference" standard for municipal entities as compared to individuals. (Dkt. 121, at 5-7.) She urges the Court to differentiate between the deliberate indifference standard for individuals (requiring subjective awareness and actual notice of suicidal ideation) with that of municipalities (requiring objective awareness by municipal policymakers that its employees are violating protected rights and failing to act despite knowledge of a serious risk or harm). *See Farmer v. Brennan*, 511 U.S. 825, 841-42 (1994); s*ee also Novack*, 226 F.3d at 530. Yet, in order for the City to have objective awareness of constitutional violations, there must first be a constitutional violation. *See Minix*, 597 F.3d at 831; *Saucedo*, 2015 WL3643417, at *4; *Alexander v. City of South Bend*, 433 F.3d 550, 557 (7th Cir. 2006) (finding that a plaintiff cannot pursue a *Monell* claim absent proof of a constitutional violation). As detailed above, Ofem's constitutional rights were not violated by any of the individual defendants. As such, the events surrounding his tragic and unfortunate death cannot support a *Monell* claim against the City. *Novack*, 226 F.3d at 531.

Even if the Court were to apply her standard, Lapre fails to prove "a pattern of similar constitutional violations by untrained employees." *Connick*, 563 U.S. at 62. As evidentiary support, she cites to testimony of "at least 20" other suicides or attempted suicides, as well as one employee stating they observed three attempted suicides during his entire career. (Dkt. 121,

at 3.) She also supports this theory with statistics about suicide rates. (Dkt. 124-15.) However, "[s]tatistics without any evidence that the failure to maintain a policy contributed to the suicides are insufficient to support a *Monell* claim." *Saucedo*, 2015 WL3643417, at *3 (quoting *Strauss v. City of Chicago*, 760 F.2d 765, 769 (7th Cir. 1985)). Nothing in the record reflects any similarities between Ofem's death and the suicides mentioned. Plaintiff makes no effort to link lack of training to those deaths nor does she supply any facts for the Court to make such a connection. Without the causal link between the other suicides and a lack of training, the existence of such deaths is irrelevant. As in all suicides, there are numerous factors that can contribute to a person taking his or her own life including mental illness, drug use, and traumatic experiences. In order to show that those deaths were based on lack of training by personnel who missed specific signs which can then constitute proximate cause to the detainee taking his own life, Plaintiff must show more than simply that they occurred.

At the heart of her claim, however, Plaintiff returns to the same facts that are not disputed – that Ofem never expressed anything to personnel that any inmate might express – that he was not hungry during a 22 hour period and he was tired. These normal reactions to being placed in custody could not trigger a heightened response by jail personnel without more; and no more training could convert the personnel's response into being an obligation to send an individual who is tired and has no appetite to a medical facility within the first 24 hours of incarceration or lest the vast majority of detainees would need such a transfer or be placed on suicide watch. Although tragic, Ofem's death cannot be linked to a lack of training. This evidence fails to establish actual notice of a constitutional violation. *Cf. Thomas*, 588 F.3d at 452-53 (finding deliberate indifference based on prison officials ignoring an inmate's symptoms of serious illness). Ofem's indicators are not enough without more or else the entire inmate population

would likely be on suicide watch. The City had, at the time of Ofem's death, a policy that was constitutional concerning training on the risk of suicide. Regardless of the degree of training, Ofem's actions alone cannot constitute actual notice sufficient for a *Monell* claim. Finally, Lapre's evidence is insufficient to prove a widespread policy of deliberate indifference on behalf of the City. For these reasons, the *Monell* claim based on a failure to train for the risk of suicide and mental health conditions cannot proceed.

## CONCLUSION

For these reasons, the Court grants the City of Chicago's Motion for Summary Judgment (Dkt. 118).

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 12, 2017